Gus S. Pancol v. Commissioner.
Gus S. Pancol v. Commissioner
Docket No. 32383.
United States Tax Court
1953 Tax Ct. Memo LEXIS 349; 12 T.C.M. (CCH) 218; T.C.M. (RIA) 53072; March 5, 1953
*349 Wm. Catlin Whitehead, Esq., for the petitioner. Elmer E. Lyon, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined deficiencies in income tax and additions to tax for fraud against the petitioner as follows: Addition to Tax
Deficiency
For Fraud
1942
$2,836.20
$1,418.10
1943
4,106.72
2,044.59
1944
1,680.66
840.33
1945
2,785.92
1,392.96
1946
6,188.17
3,094.09
The issues are whether the respondent erred (1) in determining that the petitioner's books and records did not correctly reflect his net income for the respective years and that his net income should be determined on the basis of his increase in net worth plus living expenses for such years, (2) in determining the amount of the petitioner's increase in net worth and the amount of his living expenses for said years, and (3) in determining additions to tax for fraud for such years. Findings of Fact Part of the facts have been stipulated and are found as stipulated. The petitioner resides in Anderson, Indiana, and his income tax returns for the years involved herein were filed with the collector of *350 internal revenue at Indianapolis. The petitioner was born in Greece in 1892. He came to the United States in 1906 and resided for some time with an uncle in St. Louis, Missouri. From St. Louis he went to Anderson, Indiana. After remaining in Anderson for a short time he went to Alexandria, Indiana, where he operated a candy and sandwich kitchen. Around 1917 he was drafted into the Army from Alexandria. He spent about two years in the Armed Forces and was discharged in 1919. Following his discharge, he went to Anderson, where he formed a partnership with Tom Marinaos to operate a restaurant there known as the Post Office Cafe. He continued this partnership with Marinaos until sometime in 1941, when he purchased Marinaos' interest. Thereafter and during the years 1942 through 1946, the petitioner operated the Post Office Cafe as a sole proprietorship. In December 1919 the petitioner married Penelope Panos. Within a year or two after the marriage they rented a house and Mrs. Pancol's parents, Harry and Mary Panos, came to live with them. They continued to live with petitioner and his family until their deaths in 1945. During a portion of the time Harry Panos resided with the petitioner *351 he operated a shoeshine stand. Harry and Mary Panos were not charged for room and board, but they did help petitioner from time to time by providing money "to buy a coat" for some of his children, and by purchasing a refrigerator and an ironer for his home. Once in a while they gave his children some money. After the petitioner moved into a nicer house in 1941, Mary Panos bought a piano for the petitioner's daughters. For five or six years before his death Harry Panos was sick and unable to work and during the years 1942, 1943 and 1944 both he and Mary Panos were sick. During the years 1942 through 1946, the petitioner's father and mother lived with him for about six months out of each 18 months and lived the remainder of the time with the petitioner's two brothers. Mary Panos predeceased her husband by a short time. She died testate and petitioner was the executor of her estate which was administered in the Circuit Court of Madison County, Indiana. Her husband was the sole beneficiary of her will. As reported by the petitioner as executor, her estate consisted of only one asset, namely, $2,000 in a United States Postal Savings account. Medical, funeral and administration expenses *352 totaled $1,142.50, leaving a net estate of $857.50. Harry Panos died testate and the petitioner was the executor of his estate which also was administered in the above-named court. As reported by the petitioner as executor the sole asset of the estate was $857.50 received from the estate of Mary Panos. Hospital, funeral and administration expenses totaled $857.50, leaving no net estate. The records of the collector of internal revenue for the district of Indiana fail to show that an income tax return was filed by either Harry Panos or Mary Panos for any year during the period 1917 through 1945, or that a gift tax return was filed by either for any year during the period 1942 through 1945. Seven children were born to the petitioner and his wife. Their names and years of birth are as follows: Angeline
1920
Mary
1922
Sophia
1924
George
1927
Marguerite
1933
Satiria
1935
Theodora
1937
Upon their graduation from high school, the petitioner sent his children to college. Angeline, the oldest child, graduated from college in 1942. She began teaching in the public schools of Anderson in the fall of that year and continued to teach there throughout 1946. After *353 graduating, Angeline continued to live with the petitioner. Her compensation as teacher, after withholding for income tax, was as follows: 1942, $402.50; 1943, $1,270.65; 1944, $1,306.25; 1945, $1,374.04; and, 1946, $1,670.46. Mary graduated from college in 1945 and taught during the school year 1945 - 1946. Her compensation for the school year was $1,500, after withholding for income tax. After graduating, she continued to reside with the petitioner until her marriage in August 1946. Upon receipt of their pay checks Angeline and Mary turned them over to their mother, who cashed some of them and had the remainder of them deposited in the petitioner's checking account in connection with the payment of bills for purchases that she or they had made. Sometimes she gave Angeline and Mary some spending money. Sophia went to college for about a year or a year and one-half. She then discontinued school to assist the petitioner full time in the operation of the restaurant. She continued to live with the petitioner. George entered Northwestern University in the fall of 1944 and continued there until he entered the Army on April 4, 1945. He was discharged from the Army on December 29, 1946. Since *354 then he has been attending Indiana University. The younger children were still attending public school during the years in question. During 1942 through 1946 the petitioner operated the Post Office Cafe with paid employees and with the assistance of members of his family. During the war years the restaurant was kept open twenty-four hours a day, except for one day a week. The three older girls and George helped the petitioner in the business when they were not otherwise employed. After 1943 Sophia worked full time during the day. In the conduct of the business the petitioner, among other things, did all of the buying and had charge of the cooking, but left to others such bookkeeping as was done and the issuance of checks in payment of bills. The petitioner did not pay his children any salary or wages, as such, for their services. He did give them some spending money. On some occasions he gave them cash and on others they got cash from the restaurant receipts. At times the girls made purchases on charge accounts in the names of the petitioner and of his wife and later used money from the restaurant to make payment therefor. The petitioner paid his hired help in cash and likewise *355 paid cash for all purchases of butter, eggs, milk and similar items. He paid certain bills, as for meat, by check. He examined all bills that were paid each day. At intervals, ranging usually from two to four days, deposits were made in a checking account the petitioner maintained under the name of Post Office Cafe with the Citizens Banking Company in Anderson. The petitioner and his daughters Angeline, Mary and Sophia had authority to write checks on the account. The daughters wrote most of the checks. So far as appears, the only book of account kept with any regularity was a cash book. The general procedure was "that whoever was there" (usually Angeline, Sophia, Mary or George) at eight o'clock in the evening was charged with the checking of the cash and the making of entries in the cash book. The amount shown on the cash register tape was entered in the book, as were the cash expenditures "that were on the hook for that day." The money on hand was counted, but there is no showing that such balance of cash on hand was entered in the book, or that any record was made of cash taken by petitioner or his children or of money used for purposes other than the payment of the items "that *356 were on the hook." The cash book did now show disbursements for wages. Those disbursements were recorded in a record maintained for unemployment compensation insurance and social security tax. Just what recording, if any, was maintained of bank deposits and checks is not shown. At the time of the trial herein, the petitioner had some canceled checks for the years in question, but neither the amounts covered by those checks nor the number of checks were disclosed. The remainder of the canceled checks had been lost or destroyed. No amounts were entered on the cash book as cash receipts from the business for the first three months of 1942. The amounts shown by the book as cash receipts from the business for the remainder of 1942 and through 1946 were as follows: Year
Amount
April 1 -
December 31, 1942
$ 66,240.64
1943
102,993.53
1944
114,956.91
1945
124,609.79
1946
120,589.64
The wages paid by the petitioner in the operation of his restaurant for the years 1942 through 1946, as shown by his records, were as follows: 1942
$14,961.71
1943
17,339.13
1944
27,411.81
1945
25,594.98
1946
22,379.22
On his income tax returns for the years *357 1942 through 1946, the petitioner reported as the results of his restaurant operations the following: Cost of
Goods Sold
Net
and Other
Profits
Total
Business
from
Year
Receipts
Deductions
Business
1942
$ 69,175.85
$ 66,054.68
$3,121.17
1943
100,569.09
98,500.76
2,068.33
1944
112,072.13
109,528.44
2,543.65
1945
126,010.60
122,831.79
3,178.81
1946
116,014.54
112,933.18
3,081.36
Except for the year 1943, the amounts claimed by petitioner on his returns for the years in question as salaries and wages, which amounts constituted part of the "Other Business Deductions" shown in the table above, were substantially in accord with the amounts of wages shown for the said years in petitioner's record thereof. As between the returns and the records mentioned, there was a variance of from a few cents to one dollar for the years 1942, 1944 and 1946. For the year 1943, the amount of the claimed deduction for salaries and wages was $18,571.84, whereas the wages paid in that year according to petitioner's records amounted only to $17,339.13. Between 1919 and 1942 the petitioner purchased several improved and unimproved parcels of *358 real estate. On December 31, 1941, the petitioner owned the following properties in Anderson: 301 East 13th Street
Residence
1409 West 14th Street
Residence
1322 Fletcher Street
Residence
2112 Nichol Avenue
Residence
Lots on Mounds Road
Lots at 12th and Sycamore Streets
From the time the petitioner acquired the property at 301 East 13th Street, during the early 1920s, until 1941, he occupied it as his personal residence. Upon purchasing the property at 2112 Nichol Avenue in 1941, the petitioner moved to it and has since occupied it as his residence. The house is of brick construction and has eight or nine rooms of which four are bedrooms. The property at 1322 Fletcher Street was a residence which the petitioner remodeled into three apartments. Title to all the above real estate was taken in the name of the petitioner and his wife as tenants by the entirety. The petitioner owned the furniture and fixtures used in the operation of the restaurant. Throughout the years 1942 through 1946 the petitioner rented the properties at 301 East 13th Street and 1322 Fletcher Street. He also rented the property at 1409 West 14th Street throughout the years 1942 to the *359 time of its sale about January or February 1946. The only record maintained by petitioner with respect to the rental properties was a book from which were issued receipts for cash payments of rentals. Sometimes rentals were paid by check and so far as appears receipts were not issued for such payments. Sometimes the rentals were paid to the petitioner's daughters at the restaurant and at other times they were paid to the petitioner personally. The following is a statement of the total rentals received by the petitioner for the years indicated, the total rentals reported by him in his income tax returns for the respective years and the amounts by which rentals were understated: Rentals
Rentals
Rentals
under-
received
reported
stated
1942
$2,640
$1,220
$1,420
1943
2,640
900
1,740
1944
2,640
1,680
960
1945
2,640
1,080
1,560
1946
2,200
1,040
1,160
In his return for 1942, petitioner reported $1,220 as having been received as rent on an apartment house purchased in 1940, at a cost of $7,500, with a 25-year life. A deduction of $300 was taken for depreciation, leaving $920 as the net rental reported. In his return for 1943, petitioner *360 reported $900 as having been received as rent on a property purchased in 1938, at a cost of $7,500, with a 25-year life. Deductions of $300 for depreciation, $118 for repairs, $115 for insurance, $166.15 for taxes, and $234 for miscellaneous were taken, leaving a claimed net loss of $33.15 on the property for the year. In his return for 1944, petitioner reported $1,680 as rents received. He listed three properties, two houses and a three apartment property, all as having been acquired in 1943. One house was shown as having cost $6,500, with a life of 33-1/3 years, and on which the depreciation claimed was $195. The other house was shown as having cost $4,500, with a life of 33-1/3 years, and on which the depreciation claimed was $135. Deductions of $330 for depreciation and $185 for "Oil For Rental" were claimed, leaving $1,165 as the net rental reported. In his return for 1945, the petitioner reported $1,080 as having been received as rent on an apartment house acquired in 1943, at a cost of $6,500, with a life of 33-1/3 years, and on which the depreciation claimed was $195. An added claim of $225 for "Oil For Rentals" was also made, leaving $660 as the net rental reported. *361 In his return for 1946, the petitioner reported $1,040 as having been received as rent on an apartment house acquired in 1943, at a cost of $6,500, with a life of 33-1/3 years, and on which the depreciation claimed was $195. Added claims of $183 for taxes on apartments and $225 for oil for apartments were also made, leaving $437 as the net rental reported. The petitioner furnished heat for the property at 1322 Fletcher Street, which consisted of three apartments. He also furnished the utilities - electricity, gas and water. For the years 1942 through 1946, the petitioner paid real estate taxes on his rental properties as follows: 1942, $301.10; 1943, $271.04; 1944, $264.26; 1945, $293.30; and 1946, $338.67. In March 1946, the petitioner purchased a one-half interest in certain real estate, designated Park Place real estate, for $1,000. Thereafter and within six months from the date of purchase, the petitioner sold his interest in the property at a gain of $400, no part of which was reported in his income tax return for that year. On the sale of the property at 1409 West 14th Street in January or February 1946, the petitioner realized a taxable long-term gain of at least $1,435, *362 no part of which was reported in his return for that year. In 1946, and after the sale of the 14th Street property the petitioner purchased other real property on which he made a deposit and in 1947 took title to the property. In liquidation of an account he had in a bank in Anderson which closed in 1932 or 1933, the petitioner received on an undisclosed date and at an undisclosed basis, five shares of stock of a par value of $100 each in Hughes-Curry Company. Either in 1944 or in a prior year the company went into liquidation. The petitioner received as liquidating dividends on his stock, $375 in 1944, $62.50 in 1945 and $35 in 1946, or a total of $472.50. As shown heretofore, not all the receipts from the petitioner's restaurant business were deposited in his checking account, nor did all the deposits made in that account represent receipts from the restaurant business. On a number of occasions pay checks of Angeline and Mary and possibly some cash from some of their pay checks which had been cashed by their mother were deposited in the account. A total of two-thirds of the salaries received by them each year were deposited in the account. On an undisclosed number of occasions *363 involving undisclosed amounts, checks were drawn on the account to pay for purchases made on charge accounts in the name of the petitioner and his wife and on charge accounts in the name of Angeline, Mary and Sophia. So far as is shown, no part of the balances in the petitioner's bank account at the end of the years 1941 through 1944 and at the end of 1946 originated with, or belonged to, any other person than the petitioner. The account was overdrawn at the end of 1945. Total deposits made in the petitioner's checking account for the years herein were as follows: 1942
$76,010.99
1943
81,633.59
1944
95,865.38
1945
92,585.44
1946
89,435.61 Of the amount deposited during 1942, $16,524.29 was deposited during the period from January 1 through March 31, 1942. From the time of her marriage in 1919 through 1946, Mrs. Pancol had no employment outside of her home and had no outside income except some money she may have received from roomers during the 1920s. During the early 1930s she lost an undisclosed amount of money as the result of a bank failure. The petitioner provided her with funds for meeting expected family requirements and at times he also gave her *364 extra sums which she did not spend. During 1944 through 1946 Mrs. Pancol and the petitioner had charge accounts as follows, on which the indicated amounts were paid during the respective years: 1944
1945
1945
Mrs. Pancol
Fair Store, Anderson, Indiana
$ 924.30
$1,093.06
$ 897.23
* Roth's Inc., Anderson, Indiana
538.75
659.95
228.40
Banner-Whitehill, Indianapolis, Indiana
635.00
201.00
L. S. Ayers & Company, Indianapolis, Indiana
50.00
Petitioner
Hoyt-Wright Co., Anderson, Indiana
150.61
65.48
G. W. Gates & Co., Anderson, Indiana
2,073.10
2,462.82
6,086.31
Kelly Furniture Co., Anderson, Indiana
37.35
82.00
During 1946 the petitioner purchased a Plymouth automobile from Jones Auto Company, Pendleton, Indiana, for which he paid $1,122. When his daughter Mary married he gave the automobile to her and her husband. The petitioner made payments of premiums on personal insurance as follows: 1944
1945
1946
Prudential Insurance Company
$ 30.34
$ 30.34
$ 15.17
Prudential Insurance Company
196.20
196.20
196.20
Metropolitan - Casualty Insurance
10.00
10.00
10.00
Indianapolis Life
151.20
151.20
151.20
Packard Auto Insurance
53.38
86.38
73.65
Pontiac Auto Insurance
51.15
Dwelling 2112 Nichol Ave. Insurance
180.00
$492.27
$474.12
$626.22
*365 Mrs. Pancol had a life insurance policy with Equitable Life Assurance Society, on which a premium of $225.70 was paid in 1945, and a premium in the same amount was paid in 1946. During the period 1943 through 1946 the petitioner's daughters Angeline, Mary and Sophia had charge accounts at the Unique Shop, G. W. Gates & Company and Delawter Jewelers which stood in the name of one or more of the daughters. Payments on these accounts were made either in cash or by check on the petitioner's checking account. Some of the cash so used was obtained from their mother. During 1944 through 1946, there was no charge account in the petitioner's name at the Unique Shop. There was a charge account in his name at Delawter Jewelers and on one occasion during the taxable years herein Sophia purchased on the account a watch costing about $70. Thereafter she made payment for the purchase with cash originating with the petitioner. This was the only purchase made on the account during the years in question. The petitioner's daughter Mary was married in Anderson. She had a church wedding, at which there were a number of attendants. She had a party or dinner before the wedding. After the wedding there *366 was a reception, for which a ballroom was rented. Wedding clothing for Mary, clothing for the attendants, flowers, and ballroom rent in undisclosed amounts were charged to the petitioner. The wedding clothing was purchased on the petitioner's charge account at G. W. Gates & Company. For their clothing, the attendants made payment to Mary or to her sisters of a total of $300. The petitioner's son George was in the Army overseas from October 1945 to November 1946. During this period he sent to his mother a total of approximately $1,300 to be kept for him and to be used for the purchase of a car when he left the service. Following his separation from the service and in 1947, the money George had sent to his mother was deposited in the petitioner's checking account and the petitioner issued his check for about $1,700 in payment of a car for George. In his income tax returns for 1942 through 1946, the petitioner reported net income or adjusted gross income as follows: Adjusted
Net Income
Gross Income
1942
$3,435.00
1943
1,692.40
(Victory tax net income $2,035.18)
1944
$3,708.68
1945
3,838.81
1946
3,518.36
In his income tax return for *367 1942, the petitioner claimed the full credit for husband and wife and in addition claimed credit for the following of his children as dependents under 18 years of age: Marguerite, Satiria, Theodora and George. He also took credit for Harry Panos and Mary Panos as dependents, stating that they were 85 and 75 years of age, respectively, and that he was their sole support. Although the petitioner's return was not signed, it was filed by him or someone employed by him. In his income tax returns for 1943 through 1946, the petitioner claimed the full credit for husband and wife and in addition claimed dependency credits for the same four of his children as in 1942 and in his returns for 1943 and 1944 also claimed Harry Panos and Mary Panos as dependents. In determining the deficiencies involved herein the respondent determined that the petitioner's records were inadequate and failed properly to reflect his correct income, and determined the net income for the respective years on the basis of the increase in the petitioner's net worth each year plus an additional amount for living expenses. After having determined the dates of acquisition, cost, and estimated life of the various parcels *368 of real estate and restaurant equipment and the depreciation with respect thereto to the end of the respective years, the respondent made the following determination of the petitioner's net worth at the end of the indicated years: Assets
1941
1942
1943
1944
1945
1946
Current Assets: Bank Accounts -
Citizens Banking Co.: Post Office Cafe -
checking account
$ 538.86
$ 2,028.57
$ 1,827.55
$ 234.19
($ 268.45)
$ 1,626.53
Savings account -
Gus Pancol #34339
3,517.50
Savings account -
Mrs. Gus Pancol #32050
1,080.00
3,871.39
5,046.37
Fixed Assets: Restaurant equipment
1,000.00
1,000.00
1,000.00
1,000.00
1,225.00
1,225.00
Automobiles
1,000.00
1,000.00
1,000.00
2,000.00
1,000.00
1,000.00
Real property
34,300.00
34,300.00
34,300.00
34,300.00
36,300.00
34,950.00
Total Assets
$36,838.86
$38,328.57
$38,127.55
$38,614.19
$42,127.94
$47,365.40
Liabilities and Depreciation
Reserves
Liabilities: Notes Payable -
Citizens Banking Co.
$ 500.00
$ 1,000.00
Mortgage Payable - Anderson
Federal Savings & Loan
941.85
Mortgage Payable -
Anderson Banking Co.
$10,584.54
5,974.90
Depreciation Reserves: Restaurant Equipment
1,000.00
1,000.00
1,000.00
1,000.00
1,022.50
1,045.00
Real Property
3,990.00
4,485.00
4,980.00
5,475.00
5,970.00
3,330.00
Total Liabilities and Depreciation
Reserves
$15,574.54
$12,401.75
$ 5,980.00
$ 6,475.00
$ 7,492.50
$ 5,375.00
Net Worth
$21,264.32
$25,926.82
$32,147.55
$32,139.19
$34,635.44
$41,990.40
*369 To the following increases or decrease in net worth for the respective years, as reflected by the above statement, the respondent added the following amounts which he determined as petitioner's living expenses for the respective years and the resulting totals he determined to be the petitioner's correct net income for such years: Increase in
Living
Correct
Net Worth
Expenses
Net Income
1942
$4,662.50
$10,000.00
$14,662.50
1943
6,220.73
10,000.00
16,220.73
1944
(8.36)
10,877.04
10,868.68
1945
2,496.25
11,849.49
14,345.74
1946
7,354.96
16,172.23
* 22,092.19
The amounts determined by the respondent as petitioner's living expenses for 1944, 1945 and 1946 were composed of the following items: 1944
1945
1946
Payments on credit purchases: Fair Store, Anderson, Indiana
$ 924.30
$1,093.06
$ 897.23
Roth's Inc., Anderson, Indiana
538.75
659.95
228.40
Banner-Whitehill, Indianapolis, Ind.
635.00
201.00
L. S. Ayres & Co., Indianapolis, Ind.
50.00
Hoyt-Wright Co., Anderson, Indiana
150.61
65.48
G. W. Gates & Company, Anderson, Indiana
2,256.72
2,351.60
6,277.00
Kelly Furniture Store, Anderson, Indiana
180.39
202.85
182.85
Delawter Jewelers, Anderson, Indiana
926.24
739.30
308.75
Unique Shop, Anderson, Indiana
858.37
617.30
787.60
Jones Auto Company, Pendleton, Ind.
1,122.00
Insurance - personal: Prudential Insurance Company
$ 30.34
$ 30.34
$ 15.17
Prudential Insurance Company
196.20
196.20
196.20
Metropolitan - Casualty Insurance
10.00
10.00
10.00
Indianapolis Life
151.20
151.20
151.20
Packard Auto Insurance
53.38
86.38
73.65
Pontiac Auto Insurance
51.15
Dwelling 2112 Nichol Ave.
180.00
Equitable Life (on Mrs. Pancol)
225.70
225.70
$6,177.04
$7,149.49
$10,972.23
Additional expenses - estimated: Food
$ 3,000.00
$ 3,000.00
$ 3,000.00
Utilities, fuel, etc.
500.00
500.00
500.00
Automobile expense
200.00
200.00
200.00
Entertainment
500.00
500.00
500.00
Miscellaneous (Cash purchases at above stores)
500.00
500.00
500.00
Wedding party and reception
500.00
Total
$10,877.04
$11,849.49
$16,172.23
*370 In determining the deficiencies here involved, the respondent allowed the petitioner the standard deductions for the years for which applicable. He also allowed petitioner the credits for dependents and personal exemptions claimed in his returns. During the years 1942 through 1946, and except as to the previously indicated entries in the cash book by Mary, Sophia and George, Angeline kept the petitioner's books and records. After the close of each year she prepared a statement purporting to reflect petitioner's receipts and disbursements for the year. She also showed in the statement the names of the persons whom the petitioner was to claim as dependents. The statements were often carelessly prepared. She regarded the matter as a bother or nuisance and was more interested in getting the chore over with than in making certain she was supplying the correct data. After Angeline had prepared the statements, she gave them to an accountant whom the petitioner employed to prepare his income tax returns. In some instances, the accountant requested additional information and this was furnished to him orally by either Angeline or Sophia. After the accountant had prepared the returns he gave *371 them to Angeline or someone at the restaurant. Angeline never examined the returns nor checked them against the statements that she had prepared. The only thing she did with respect to them was to see that payment was made on them. During the period 1917 through 1941, the petitioner filed income tax returns for all years except 1918, 1926, 1929, 1930 and 1932. He reported no tax due on the returns filed, except those for 1919 and 1920, on which the taxes reported and paid were $8.90 and $31.78, respectively. For the years herein petitioner's books and records were incomplete and inadequate for Federal income tax purposes and his net income could not be correctly determined therefrom. Opinion From the evidence, we have concluded and found that the petitioner's books and records were incomplete and inadequate for the determination of his net income. The respondent was accordingly justified in determining, first, the increase in petitioner's net worth for each of the years in question and then adding thereto for each year the amount determined to have been spent by petitioner during the year for personal and living expenses. Our problem, then, relates to the correctness of the *372 amounts by which the respondent has determined petitioner's net worth increased in each of the taxable years and of the amounts determined by him to have been spent during each year for personal and living expenses, and the burden of showing that these items, as determined by the respondent, are excessive and the extent to which they are excessive, is on the petitioner. The respondent has conceded that he failed to include in petitioner's assets at the beginning of the period, five shares of stock in Hughes-Curry Company and that these shares were liquidated through cash distributions of $375 in 1944, $62.50 in 1945, and $35 in 1946, or a total of $472.50. The petitioner is accordingly entitled to have his net worth increased at the beginning of the period by the basis to him, for gain or loss, of the said stock, and in computing net worth at the end of the years 1944, 1945 and 1946, an allowance should be made for the cash liquidations received on the stock during each such year. In other words, to the extent of the cash liquidations, the asset would not be represented as stock but would be accounted for as a part of the cash spent during the year or on hand at the end of the year. *373 Aside from the above, and in the course of the trial herein, the parties stipulated that the items appearing in the net worth statement as determined by the respondent were correct. It was further agreed that title to the real estate appearing therein was all held by the petitioner and his wife by the entirety and that the petitioner was free to make such arguments by reason thereof as he saw fit and proper; and further, that the stipulation was not to be a bar to argument by the petitioner that the balances in the savings account standing in the name of Mrs. Gus Pancol at the end of 1944, 1945 and 1946, had erroneously been included in the assets on the statement of petitioner's net worth. Subject to those two qualifications, petitioner's counsel stipulated that the net worth statement of respondent's determination was not questioned. Other than to suggest or intimate generally that, by reason of the inclusion of the entirety property in the assets of petitioner, the respondent's net worth determination resulted in the determination of an excessive amount as petitioner's taxable income, we do not know just what argument or contention the petitioner's counsel intended to make. *374 At no time during the trial nor at any place in his brief, has he shown or demonstrated just what adjustments he feels should be made, nor is there any workout showing what the effect of those adjustments would ultimately be in the determination of petitioner's taxable income. And in the absence of such showing or demonstration, we are unable, on the record in this case, to find and determine that the adjustments which would be required by the elimination of the real estate, in so far as Mrs. Pancol may be deemed to be its owner, would result in any reduction of the increases in net worth or the net income of petitioner, as determined by the respondent. Rather obviously, no change favorable to the petitioner could result for the years 1942, 1943, or 1944. The various items of real estate were included in the net worth statement at cost and remained unchanged through 1944. It follows, as a matter of course, that if half of the amount be regarded as belonging to petitioner's wife, the assets in the net worth statement would be reduced by exactly the same amount at both the beginning and end of each year, and no change would result in the amounts representing increases of net worth during *375 the year. For 1945, there was an increase of $2,000 in real estate, which increase resulted from the purchase of a vacant lot. But as to that lot, the petitioner testified that he bought it, and there is no claim or contention, so far as we are able to determine from the very rambling discourse in the brief filed, that the lot was not bought by petitioner and with his funds. If so, the cost of that lot was properly charged to him in the net worth statement. If an elimination is made from the net worth statement in respect of the real estate held by petitioner and his wife by the entirety, it would likewise be necessary to eliminate a corresponding portion of the amounts appearing in the statement representing depreciation reserves on the real estate, and the elimination of any portion of the amount representing the increase in the depreciation reserve for each of the years would serve to increase, and not reduce, petitioner's net worth at the end of such years. It further appears that, even though the proof shows that petitioner paid the taxes on the real estate in the years in question, the respondent has not increased the amounts representing petitioner's expenditures during *376 each of the years for any payments made by petitioner of taxes on his wife's share or interest in the real estate. In the normal course of reporting income it is, of course, true that any income included in gross income which was used for payment of real estate taxes would be an allowable deduction in determining net income. Where, however, one spouse pays the full amount of the taxes on property held by the entirety, it does not necessarily follow that he would be entitled to the deduction of the full amount of the taxes paid, see Oren C. White, 18 T.C. 385, and it might be, if the facts were fully known, that petitioner used his income in paying his wife's taxes and a further addition should be made, to that extent, in arriving at his net income. Conceivably, the petitioner might be entitled to a reduction in the real estate appearing in the net worth determination as of the end of 1946, since one item of property acquired prior to 1942 was sold in 1946, and thereby converted into cash. It appears, however, that another piece of property which does appear in the assets as of the end of 1946 was acquired during the year and down payment of some amount [1] was paid thereon. *377 Presumably title to that property likewise was taken in the name of petitioner and his wife by the entirety. The state of the record, however, is such that it is not possible to say that Mrs. Pancol did not actually receive, for her separate benefit, all of the profit resulting from the sale which might be allocable thereon by reason of her entirety rights, and, if so, there would be no adjustment of petitioner's assets in the net worth statement which would be of benefit to him, particularly since the elimination of half of the depreciation reserve at the end of 1946 would serve to increase, and not reduce, the amount by which his net worth had increased by the end of the year. *378 As already stated, the petitioner has not shown or demonstrated that the making of the adjustments which would be required if a portion of the real estate, title to which was held by petitioner and his wife by the entirety, should be eliminated, would result in any adjustment of the net worth figures in a manner favorable to him. Whatever the claim or workout his counsel may have had in mind, has not been shown of record. With respect to the balances in the savings account of petitioner's wife, we think the result should be otherwise. Under I.T. 3898, 1948-1 C.B. 55, the respondent has ruled, with respect to taxpayers in the State of Indiana, that the income from, as well as the gains on the sale of, real property held by husband and wife as tenants by the entirety is to be reported one-half as the income of each. At no place in this proceeding has the respondent indicated any purpose or intent to disturb or seek reversal of that ruling. See and compare Edwin F. Sandberg, 8 T.C. 423, and Paul G. Greene, 7 T.C. 142. Furthermore, the income tax returns herein are not joint returns, but the individual returns of the petitioner, and the respondent *379 has not suggested or contended otherwise. The facts show that, except for 1946, when the amount received was $2,200, the rental on the entirety properties was $2,640 for each of the taxable years involved; and it is not disputed that some gain was realized on the sale of the 14th Street property in 1946, although the record is quite confused as to the amount, and under the above ruling, one-half of that gain was taxable to Mrs. Pancol, not to petitioner. Again noting the confused state of the record, we nevertheless think it a reasonable conclusion thereon that one-half of the rental mentioned and one-half of the gain realized were such as to leave in the hands of Mrs. Pancol the sums remaining as the balances in her savings account at the end of 1944, 1945 and 1946. We accordingly hold that the respondent erred in his inclusion of the said balances as assets of the petitioner in his net worth determination. It is, of course, true that Mrs. Pancol testified that she had never filed an income tax return and the petitioner, in his returns for the years before us, did claim the full husband and wife exemption credit allowed under the statute. Be that as it may, however, we do not have *380 the case of Penelope Pancol before us in this proceeding. On brief, the petitioner's counsel attempts further argument, to the effect that the respondent's net worth determination was erroneous in certain other respects. In view of the fact, however, that the points he thus attempts to raise on brief are contrary to his stipulation and agreement made in the course of the trial, they require no consideration here. The remaining questions bearing upon the respondent's deficiency determinations, as distinguished from his determination of fraud, have to do with the correctness of his determination of the petitioner's personal and living expenses for the taxable years. For the years 1942 and 1943, the respondent estimated and determined such expenditures at a lump sum figure of $10,000 for each year. For the years 1944, 1945 and 1946, his determinations were based, in part, on detailed expenditures made at particular stores in Anderson and Indianapolis, the purchase of an automobile, and insurance premiums paid on petitioner's life and that of his wife, and on their residence. The remainder of the expenditures determined were based on lump sum estimates of amounts spent for food, utilities, *381 automobile expense, entertainment, miscellaneous cash purchases, and wedding party and reception. The amounts actually expended at various of the stores have been stipulated by the parties and, as stipulated, are set forth in our findings of fact. In the computation under Rule 50, effect should be given to any differences between amounts actually expended at the various stores and those shown by the respondent in his determination. The amounts paid as insurance premiums have likewise been stipulated, and have been found as stipulated. Effect should also be given in the Rule 50 computation to any differences between the actual amounts paid and those shown in the respondent's determination. Effect should also be given to our findings of fact with respect to purchases at Delawter Jewelers and the Unique Shop. From an examination of the petitioner's brief, his counsel apparently accepts the lump sum determinations made by the respondent to cover expenditures representing utilities, automobile expense and entertainment for 1944, 1945 and 1946, as being fair and reasonable for all years. He questions the determinations of the respondent with respect to food, miscellaneous cash purchases *382 and the $500 determined as covering the costs of the wedding party and reception in 1946. For the years 1942, 1943 and 1944, he admits to no expenditures for either cash or credit purchases at stores. For 1945, he limits such expenditures to $70 at Delawter Jewelers and $150.61 at Hoyt-Wright Company, and for 1946, to $228.40 at Roth's, $65.48 at Hoyt-Wright Company and $1,122 as the purchase price of a car. If we understand the petitioner's arguments correctly with respect to the expenditures which he seeks to have stricken from the respondent's determination, it is that we should accept Mrs. Pancol's testimony that the food costs for her family did not exceed $10 a week for any of the years in question and that, except as noted above, all of the purchases made at the various stores during the years in question were made from the earnings of her daughters and from funds which originated with her father and mother and had been given to her or her children. The claim as to food costs is wholly out of line, even on Mrs. Pancol's own testimony. The only explanation as to how she was able to feed her family at a cost for food of only $10 a week, other than the bald assertion to that *383 effect, was that a substantial, if not a major, portion of the meals of the family were taken at the restaurant. It goes without saying that any determination of living expenses as an addition in determining net income by the increase in net worth and living expense method requires the inclusion in living expenses of the cost of the meals at the restaurant, just as much as it does the cost of the meals served at home. No testimony, rationalization, or computation was offered by the petitioner to indicate, in any manner, what the actual amount of food costs for the members of his family at the restaurant were. The petitioner has not shown that the food costs for his family were less than the amounts determined by the respondent. As noted above, amounts of the credit purchases at the stores by various members of petitioner's family have been stipulated. We think the testimony of various members of petitioner's family also indicates that purchases were made from time to time for cash, and as to the amounts of those cash purchases, it should be noted that there is no evidence in refutation of the amounts determined by the respondent therefor. There remains the question as to whether *384 the petitioner has shown by credible testimony or other evidence that the expenditures made on the various charge accounts were not made from his funds and are not chargeable to him in a net worth determination of his income for the years in question. In the main, the petitioner relies upon the testimony of his wife, which, as previously stated, in substance, is that payments for the credit purchases were from moneys received from her daughters, representing their earnings and representing gifts and donations to them by their grandmother and grandfather, and moneys received by her from her parents. The testimony is replete with contradictions and discrepancies, and while it may be true that her parents, while living with her and her husband, did at times make contributions which assisted them with the living costs for the family, we are firmly convinced that the contributions received directly by her and through the children [2] did not approach an amount at any time which would in any way indicate or demonstrate that the respondent's determination as to the expenditures from petitioner's funds for such purchases was in error, other than as shown by the stipulation as to the actual *385 amounts spent to cover purchases on the various charge accounts and such as were paid from the earnings of Angeline and Mary, discussed hereafter. In the first place, the story of the life and activities of petitioner's wife's parents not only supplies no basis for a conclusion that they at any time had earnings or funds which would permit the contributions or gifts as testified to by Mrs. Pancol, her daughters and her son. So far as appears, the sole source of income to them was the operation of a shoeshine stand and a popcorn machine. Other than the denomination shoeshine stand and popcorn machine, the type or size of the establishment is not shown, and we have no reason to believe that it was anything over and beyond a very modest establishment. For no year, did the parents of Mrs. Pancol file an income tax return. It is apparent, we think, that if they had earnings sufficient to accumulate or have on hand the moneys indicated by the testimony of Mrs. Pancol and her daughters and her son, they would have had sufficient income to require the filing of income tax returns and *386 the payment of income tax. Considering the circumstances in which the testimony here was given, we are reluctant to conclude that Mary and Harry Panos pursued the course of tax evasion indicated and having seen the witnesses and having given careful consideration to their testimony we do not so conclude. The petitioner's administration of the estates of each of the parties named indicated that they had no estates of any substance. The one asset of any moment was the United States Postal Savings Account of Mary Panos in the amount of $2,000. Even the existence of that savings account is not indicative that she would be inclined to hold $28,000 in savings in her trunk. When Harry Panos died, he had only $875.50, the amount remaining from the $2,000 postal savings account of his wife. In keeping with that picture of the affairs of Mary and Harry Panos, as shown by petitioner in his reports as executor, is the further fact that petitioner, according to his testimony, made no charge to them during the period they lived in his home for room and board. It is also to be noted that the statements made by Mrs. Pancol at various times, both prior to the trial of this case and as a witness herein, *387 are hopelessly confused and irreconcilable. At one place, she stated that after the health of her parents failed the shoeshine stand was operated for them by an employee; at another place, the operation was, to some substantial extent, under the supervision of her husband and that the operating receipts were brought home and turned over to her mother. At another point, she stated that for four or five years, after her father became unable to work, the shoeshine stand was operated substantially as her own business; that she received the proceeds, the amounts of which she was unable to estimate, but which she kept with her own money; that she kept no books with respect to such operations and never filed an income tax return. At one place, she stated that her parents, during 1942 and until their deaths in 1945, gave her about $1,500 to pay for their food, medicine and other necessities, while at another place she stated she and her husband had furnished their support from 1920 on. At another place, she stated that the shoeshine stand and the lease to the premises in which it was operated were sold sometime prior to the death of her parents; that she received the $3,500 for which it was *388 sold, during the lifetime of her parents, and that the amount was not included in the $28,000 which she stated her mother left her. She had previously stated, in an affidavit executed September 20, 1951, that subsequent to the death of her parents certain personal property which they had during their lifetime was sold and the proceeds turned over to her, during 1945 and 1946. There is no indication from the record that they had any property other than the shoeshine stand and popcorn machine, unless it was their personal effects. In another affidavit, executed June 15, 1951, she had previously stated that she received from the estates of her father and mother $22,000 in cash, $4,000 from insurance, and $4,000.98 in postal savings. There has been no showing of any insurance and the only showing as to postal savings was $2,000 belonging to her mother. Such being the picture of record, we find the testimony as to amounts to be wholly incredible, and on the basis thereof, we are not able to conclude that the amounts received by petitioner's wife and his children and used by them for purchases and personal expenditures were such as to indicate or demonstrate any error in the respondent's *389 determination with respect to similar expenditures from petitioner's funds, other than the differences noted herein. We are of the opinion that, to some extent, the purchases in question were from the salaries and earnings of petitioner's daughters Angeline and Mary. From our observation of the witnesses and from listening to their testimony, we have concluded that they did, as they testified, turn their pay checks over to their mother and that generally she controlled and directed the expenditure thereof. Part of the salaries they received back by way of allowances from the proceeds of checks which were cashed. A greater portion of their salaries, however, was deposited in the petitioner's checking account and used to apply on various of the department store accounts. No record was kept as to the amounts expended as the result of the cashing of the checks and the amounts which were deposited. Following the rule in Cohan v. Commissioner, 39 F. 2d 540, we have concluded, from a consideration of the evidence, that two-thirds of the salaries of Angeline and Mary were deposited in the petitioner's bank account and used to the extent thereof in paying department store accounts *390 charged to petitioner by the respondent in his determination. The $1,500 received by Mary was for the school year 1945-1946. One-third thereof is allocated to 1945 and the remainder to 1946. To the extent of such two-thirds of the salaries of the two daughters, the respondent's determination should be modified. Similarly, we have concluded, by applying the rule in the Cohan case, that the petitioner was reimbursed to the extent of $300 for expenditures made in behalf of attendants at Mary's wedding. From the account of the wedding, reception, etc., we have no reason, however, to conclude that the cost thereof to petitioner was in any amount less than $500, as determined by the respondent. On the fraud issue, the burden of proof is on the respondent. Frankly, we do not know whether the petitioner was or was not guilty of fraud in making his income tax returns. We are of the opinion, however that the respondent has not shown by clear and convincing proof that the deficiencies, or parts thereof, were due to fraud with intent to evade tax, and on the evidence of record, we are unable to conclude that they were. We think it apparent that both petitioner and his daughter Angeline were *391 blatantly and grossly careless and negligent in the preparation and assembling of the required data for the returns and petitioner was similarly careless and negligent in executing the returns prepared, but carelessness and negligence fall short of indicating or showing the presence of fraudulent intent. The only income-producing activities or sources of income shown or suggested by either party were the restaurant business, rental properties and, for 1946, two sales of real estate. The amounts of rental received and the real estate taxes paid have now been established with definiteness and petitioner's counsel in his stipulation as to respondent's net worth determination agreed to the depreciation allowances on the rental properties as shown therein. On one of the real estate sales, petitioner admits a short-term capital gain of $400, none of which was reported. From the other sale, the respondent determined that the long-term capital gain realized was $2,870, of which 50 per cent was taxable income to the petitioner. In his increase in net worth plus personal and living expenses determination of petitioner's 1946 income, he reduced the resulting amount by 50 per cent of the capital *392 gain determined, or $1,435, as representing the amount of non-taxable capital gain realized from the sale of property, and which would obviously account for that much of the increase in net worth or living expenses paid out for the year. We have not been able to determine from the evidence the amount of gain which was realized on the sale of the said property, and for that reason have not disturbed the respondent's determination with respect thereto or his treatment thereof. In the main, the deficiencies in tax sustained have been sustained not because admitted or proven, but because of failure on the part of the petitioner to carry his burden of showing the respondent's determination thereon was in error. The major portion of the income not definitely shown as to amount, and in respect of which the deficiencies stand on a failure of proof on petitioner's part, was rather obviously attributable to the restaurant, wherein the books, such as they were, were kept chiefly by Angeline. Such failure on the part of the petitioner to carry his burden as to the correctness of the respondent's determination of deficiencies may not, in and of itself, be regarded as proof that the deficiencies, *393 or parts thereof, were due to fraudulent intent, where by statute the burden of proof as to fraud is on the respondent. Taking into account the nature and character of the records kept and the manner in which the amounts purporting to represent the restaurant operations were prepared and submitted to the individual employed to make up the returns and petitioner's non-participation therein, it is certaintly not apparent of record that petitioner consciously and with intent to evade tax subscribed to an understatement of his profits from restaurant operations. If, then, we are to find that a part of the deficiencies was due to fraud with intent to evade tax, we are left to the petitioner's reporting, or failure to report, income from real estate and his wrongful claiming of dependency credits. With respect to the real estate, it is possible that under I.T. 3898 the petitioner for some of the years in question may have reported income equal to or in excess of the amounts taxable to him, and if that is the case, no part of the deficiencies for such years could be attributable to errors, whether intentional or otherwise, in reporting such real estate income. Furthermore, if the returns *394 herein are examined, there was not that consistency of pattern in the errors in reporting the rental income which might be expected, if the omissions were intentional, and in three of the years there was failure to claim any deduction or allowance for the taxes paid on the real estate from which the rents were reported. The failure to claim any deduction for taxes on the property, the rent from which was reported, would, in our opinion, be indicative that the errors were the result of carelessness or negligence, not fraud with intent to evade tax. With respect to the dependency credits claimed, it is true that petitioner was not entitled to claim credit for George after he was eighteen and while he was in the Army, but in those years, George was still a minor and, for all the record shows, the petitioner, if aware of the claim, may well have thought he was entitled to the credit. Dependency credits were also taken for Harry and Mary Panos during their lifetimes, and while the record is quite confused as to their financial circumstances, we have little doubt but that their current means were such as to enable them to make adequate contributions to cover their maintenance in petitioner's *395 household - and we rather think that they did. It does not follow from that, however, that the petitioner knowingly claimed the dependency credits with fraudulent intent to evade tax. It is, of course, possible that the petitioner did, with fraudulent intent, withhold from Angeline and the individual employed to make up his return for 1946, information as to his gains from the sale of real estate in that year. In the light, however, of the general picture presented as to preparation of petitioner's returns, and as indicated in the discussion above, it is our opinion that the respondent has failed to carry his burden of proving that the omission of the real estate gains was due to fraud with intent to evade tax, rather than the carelessness and negligence of both Angeline and petitioner, and of which there can be no doubt. The petitioner, on brief, argues that there being no fraud, the statutory period within which the respondent may assess the deficiencies herein has run and he is accordingly entitled to a decision of no deficiencies. He who seeks its benefit, must plead the running of the statute of limitations and prove the facts to support it. United States Business Corporation of America, 19 B.T.A. 809. *396 The pleadings herein raise no such issue. If the running of the statute had been pleaded, it might well be that petitioner would have of record a prima facie case, since his returns, photostats of which are in evidence, show the dates on which they were filed. The argument now made is merely a prolongation of an argument begun at the conclusion of the trial herein, not on motion to amend the pleadings, but on a motion for judgment. Counsel was advised that he would have to plead the issue and, after some argument, orally requested leave to amend. It then appeared that if the petitioner should be permitted, belatedly, to so amend his pleadings, hearing of the case would have to be continued, on request of counsel for the respondent, in order that he might have time to produce from the respondent's files waivers "that have been executed by this petitioner." Counsel for the petitioner not only did not deny the existence of waivers or lack of knowledge of their existence, but, to the contrary, admitted some knowledge with respect thereto; and that, even so, he had made no inquiry of the petitioner as to the signing of waivers by him nor of the Government as to whether or not they had *397 such waivers on file. Such being the circumstances, counsel was advised that the Court would not entertain the belated motion to amend his pleadings. There is accordingly no issue as to the running of the statute of limitations to be decided. The respondent not having been sustained in his determination of fraud for 1942, effect should be given in computations hereunder to the provisions of section 6 of the Current Tax Payment Act of 1943. Decision will be entered under Rule 50. Footnotes
*. On an undisclosed date in 1946 this account was changed from the name of Mrs. Pancol to that of Gus Pancol - Sophia Pancol. The payment of $228.40 shown for 1946 was made prior to the change of names.↩
*. The total of $7,354.96 and $16,172.23, or $23,527.19, was reduced by $1,435 as representing 50 per cent of capital gain.↩
1. The respondent determined the amount paid in 1946 as $5,450. The petitioner testified that he thought the net amount received for the 14th Street property was $7,000, and mentioned a payment of $3,500 in 1946 on the property purchased. Whether or not petitioner intended to give the impression that $3,500 was all that was paid on the property in 1946, is not apparent. As to the $3,500 payment, it was petitioner's testimony that said amount was deposited in his checking account and payment was made by check. The ledger sheets of the account show no comparable entries.↩
2. George testified that he spent the money given him by his grandparents on dates and other things.↩